# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| KELLY L. BARKHUFF,<br><br>     PLAINTIFF,<br><br>V.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>     DEFENDANT. | CIVIL NO.   10-01975 (SRN/TNL)<br><br><br>**REPORT & RECOMMENDATION<br>ON CROSS MOTIONS<br>FOR SUMMARY JUDGMENT** |

Andrew E. Kline, 301 4th Avenue South, Suite 270, Minneapolis, MN 55415; and

Thomas A. Krause (pro hac vice), Thomas A. Krause, P.C., 4211 Grand Avenue, Suite 1, Des Moines, IA 50312 (for Plaintiff);

Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415 (for Defendant).

## I.  INTRODUCTION

Plaintiff Kelly Barkhuff brings the present case, disputing Defendant Commissioner of Social Security's denial of her application for supplemental security income (SSI). This matter is before the Court, Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment. *See* under 28 U.S.C. § 636(b)(1) and D. Minn. LR 72.1(a)(iii)(4).

Based upon the record, memoranda, and files herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 11) be

**DENIED** and the Commissioner's Motion for Summary Judgment (Docket No. 19) be **GRANTED**.

## II.     FACTS

### A.  Background

Plaintiff Kelly L. Barkhuff was approximately 43 years old at the time she filed her application for SSI on January 31, 2007.  (Tr. at 91.)  Plaintiff asserted that she was disabled due to back injury, a herniated disc, and attention deficit hyperactivity disorder (ADHD).[1]

While Plaintiff struggled with drug and alcohol abuse at a young age, she has been sober since March 3, 2008. (Tr. 23-24, 32.)  At the time of her application, Plaintiff was living in a shelter.  (Tr. at 129.)  Plaintiff subsequently overcame homelessness and now resides with her fiancé.  (Tr. at 22.)  Plaintiff's daily activities include taking her medication, walking with her fiancé approximately a mile and a half to two miles to downtown Minneapolis and back, a few household chores, and resting for 90 minutes in the afternoon due to pain.  (Tr. at 22, 26.)  Plaintiff spends about half of her time in a reclined position due to discomfort.  (Tr. at 26.)  Plaintiff attends Alcoholics Anonymous (AA) meetings twice a week.  (Tr. at 34.)  Plaintiff also makes beaded jewelry and will complete a piece in one sitting, taking three to four hours.  (Tr. at 34.)

Plaintiff's work history includes working as a packager from 1996 to 2002, during which time she packaged gifts while in prison; Plaintiff worked six hours per day, five days per week. (Tr. at 112-13, 121-22, 199.)  In 1999, Plaintiff worked as a receptionist four hours per day, five days per week for three months.  (Tr. at 112, 114, 122, 199.)  Plaintiff also completed her GED

---

[1] "ADHD is a problem with inattentiveness, over-activity, impulsivity, or a combination" and generally affects children.  Attention Deficit Hyperactivity Disorder, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002518/ (last visited June 22, 2011).  "About half of children with ADHD will continue to have troublesome symptoms of inattention or impulsivity as adults"; "[h]owever, adults are often more capable of controlling behavior and masking difficulties."  *Id.*

in 1999.  (Tr. at 126.)  Plaintiff has not worked or looked for work since her alleged onset date of March 3, 2008.[2]  (Tr. 24, 27, 121.)

### B.  Relevant Medical History

#### 1.  <u>2005</u>

In May 2005, Plaintiff was admitted to Hennepin County Medical Center (HCMC) after she attempted to commit suicide by cutting her neck while she was intoxicated.  (Tr. at 212-13.) Plaintiff appeared anxious, and was admitted for "safety and stabilization."  (Tr. at 212, 214.) Plaintiff was diagnosed with Depressive Disorder Not Otherwise Specified (NOS).  (Tr. at 212.) Plaintiff was subsequently hospitalized for two weeks at Abbot-Northwestern Hospital.  (Tr. at 263, 489)

In July 2005, Plaintiff was referred to Nels Langsten, M.D., for a psychiatric evaluation. (Tr. at 489-91.)  Dr. Langsten's initial impressions of Plaintiff included "a long history of emotional, behavioral, chemical and legal problems"; appropriate affect with a fairly good range; "[m]emory, recall and general cognitive functions were grossly intact"; "showed a good capacity to articulate her thoughts and feelings clearly and to introspect"; no current suicidal ideation or psychotic symptoms; and her "[j]udgment and insight seemed adequate and motivation for treatment seemed good."  (Tr. at 490.)  Dr. Langsten diagnosed Plaintiff with Major Depressive Disorder, Recurrent; Rule Out Posttraumatic Stress Disorder, Chronic; Rule Out Bipolar Disorder, NOS, Polysubstance Dependence in Early Remission, in a treatment setting; and Borderline Personality Disorder.  (Tr. 490.)  At the time, Plaintiff was taking Seroquel,[3] BuSpar,[4]

---

[2] On her application, Plaintiff alleged an onset date of August 15, 2006.  (Tr. at 121.)  However, this date was subsequently amended to March 3, 2008, at the hearing.  (Tr. at 24.)

[3] Seroquel is a brand name for quetiapine, which is used "to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions)"; "alone or with other medications to treat or prevent episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)"; and is "used along with other medications to treat depression."

and Lexapro.[5]  (Tr. at 491.)  Plaintiff returned to Dr. Langsten in August 2005, stating that she was feeling okay, but under considerable stress due to her mother's illness; Plaintiff was directed to continue taking her medication.  (Tr. at 262.)  Plaintiff saw Dr. Langsten again in October 2005, at which point he prescribed Ambien[6] in order to reduce the amount of Seroquel that Plaintiff was taking at night.  (Tr. at 261.)  During the August and October visits, Dr. Langsten observed that Plaintiff appeared anxious, but not depressed; her affect was appropriate and her cognitive functions intact; she did not present with suicidal ideation or psychotic symptoms; her judgment was adequate; and she seemed motivated for treatment.  (Tr. at 261-62.)

### 2.  2006

Plaintiff returned to HCMC on August 1, 2006, complaining that she was depressed.  (Tr. at 220.)  Plaintiff reported that she had stopped taking her medications for approximately four months due to drug use and would like to resume taking her medication.  (Tr. at 220.)  On August 8, 2006, Plaintiff was seen at HCMC for right ankle pain, which she described as a "burning pain" that "shoots up my leg."  (Tr. at 223.)  Plaintiff was given ibuprofen and left.  (Tr. at 224.)  Plaintiff returned to HCMC on August 15, 2006 for a refill of her medication and was given a prescription for Desyrel[7] in place of Ambien.  (Tr. at 226.)

On September 26, 2006, Plaintiff was seen by Dr. Langsten, where she reported that "she relapsed to substance use" in February 2006 and continued using drugs until she went to

---

*Quetiapine*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html (last visited July 6, 2011).

[4] BuSpar is a brand name for buspirone, a medication "used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety."  *Buspirone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/ (last visited June 21, 2011).

[5] Lexapro is a brand name for escitalopram, a medication "used to treat depression and generalized anxiety disorder."  *Escitalopram*, NAT'L CTR. FOR BIOTECHNOLOGY INFO.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/ (last visited June 21, 2011).

[6] Ambien is a band name for zolpidem, a medication "is used to treat insomnia."  *Zolpidem*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928/ (last visited June 21, 2011).

[7] Desyrel is a brand name for trazodone, a medication that is used to treat depression as well as insomnia and schizophrenia.  *Trazodone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/ (last visited June 21, 2011).

treatment in late July 2006.  (Tr. at 260.)  Plaintiff did not take her medication during her relapse period.  (Tr. at 260.)  Dr. Langsten described Plaintiff as "somewhat anxious" during the appointment and made similar observations regarding Plaintiff's affect, cognitive functions, judgment, insight, motivation for treatment, and lack of suicidal ideation and psychotic symptoms.  (Tr. at 260.)  Plaintiff was given prescriptions for Lexapro, BuSpar, and Ambien. (Tr. at 260.)  On September 28, 2006, Plaintiff's Lexapro prescription was changed to Celexa[8] because of an insurance issue.  (Tr. at 259.)

On November 29, 2006, Plaintiff attended Fremont Community Health Services (Fremont) for follow-up treatment regarding visits to the emergency room during the previous week for pain associated with her right hip and low back pain.  (Tr. at 249.)  Plaintiff reported that she was diagnosed with a herniated disk and given Demerol[9] as well as prescriptions for Percocet[10] and Robaxin.[11]  (Tr. at 249.)  Plaintiff also reported that she was taking a "high dose of ibuprofen." (T. at 249.)  Plaintiff reported that she returned to the emergency room five days later because she had run out of pain medication and her pain was worse.  (Tr. at 249.)  Judy Orfiled, N.P., observed that Plaintiff had "tenderness with palpitation, specifically in the lumbar spine" and scheduled Plaintiff for magnetic resonance imaging (MRI) of her lumbar spine. (Tr. at 249.)  The following day, an MRI was performed at North Memorial Medical Center:

---

[8] Celexa is a brand name for citalopram and "is used to treat depression."  *Citalopram* , NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited June 21, 2011).
[9] This is a brand name for meperidine and "is used to relieve moderate to severe pain."  *Meperidine*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000583/ (last visited June 21, 2011).
[10] Percocet is the brand name of a drug containing oxycodone and acetaminophen and "is used to relieve moderate to severe pain."  *Oxycodone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589/ (last visited June 21, 2011).
[11] Robaxin is a brand name for methocarbamol, which "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  *Methocarbamol*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000718/ (last visited June 21, 2011).

FINDINGS: Alignment of the lumbar spine is satisfactory. There is no abnormal bone marrow signal. The conus medullaris and cauda equine are within normal limits.

At L5-S1, there is a small broad-based disc bulge and there are mild degenerative changes of the posterior facets, which results in mild to moderate left and mild right neural forminal narrowing,[12] but minimal narrowing of the spinal canal.

At L4-5 and L3-4, there are mild degenerative changes of the posterior facets, but no significant spinal canal or neural forminal narrowing.

At L2-3 and L1-2, the spinal canal and neural formal appear widely patent.

IMPRESSION:
Degenerative changes of the lower lumbar spine, most severe at L5-S1, where a combination of posterior facet arthropathy and a mild broad-based disc bulge result in mild to moderate left and mild right neural foraminal narrowing.

(Tr. at 284.) Fremont's records also indicate that there was concern over Plaintiff's repeated requests for pain medication. (*See* Tr. at 246, 249.)

### 3. <u>2007</u>

On January 2, 2007, Plaintiff sought treatment at North Memorial Clinic—Golden Valley for back pain and was seen by Karen A. Fraley, D.O. (Tr. at 240.) Plaintiff reported that she had a history of degenerative disc disease in the lumbar spine and that she was not satisfied with the care she received at Fremont. (Tr. at 240.) Plaintiff's pain was described as "radiat[ing] into the posterior lateral aspect of the right thigh, but does not extend beyond the knee." (Tr. at 240.) Plaintiff stated that the pain disturbs her sleep. (T. at 240.) Plaintiff reported that she was currently taking BuSpar, Ambien, ibuprofen, Percocet, and Robaxin. Plaintiff requested that her Percocet prescription be refilled. (T. at 240.) Dr. Fraley reviewed the MRI and advised Plaintiff

---

[12] "The neural foramina is an opening between vertebrae through which nerves leave the spine and extend to other parts of the body." *MacDonald v. Astrue*, No. 06-10815-RGS, 2007 WL 1051507, at *2 n.2 (D. Mass. 2007).

that she was "not likely a surgical candidate, but may benefit from a cortisone injection."  (Tr. at 241.)  Dr. Fraley referred Plaintiff to Medical Advanced Pain Specialists (MAPS); gave Plaintiff a limited number of Percocet; refilled her Robaxin and ibuprofen prescriptions; and wrote a prescription for Neurontin,[13] which she suggested that Plaintiff try.  (Tr. at 241.)

Plaintiff returned to see Dr. Langsten on January 4, 2007.  (Tr. at 258.)  Plaintiff reported that she "is doing well," but "has been having back pain."  (Tr. at 258.)  Plaintiff told Dr. Langsten that Dr. Fraley had started her on Neurontin, but that it made her feel groggy; Dr. Langsten suggested that Plaintiff follow up with Dr. Fraley regarding the side effects she was experiencing.  (Tr. at 258.)  Dr. Langsten documented Plaintiff's mood as "somewhat anxious at times but not depressed" and described Plaintiff as "fully oriented, coherent and relevant."  (Tr. at 258.)  Dr. Langsten continued Plaintiff's BuSpar and Ambien prescriptions.  (Tr. at 258.)

On January 5, 2007, Plaintiff was seen by James V. Anderson, M.D., and Patricia Tomshine, R.N., M.S.N., C-N.P., of MAPS for treatment of "back pain that radiates into the right buttock and upper thigh."  (Tr. at 393.)    Plaintiff reported that her pain is worse when she sits in any one position for too long.  (Tr. at 394.)  Dr. Anderson gave Plaintiff a lumbar epidural steroid injection at L5-S1 on the right and Plaintiff was given a referral for physical therapy.  (Tr. at 396-98.)  On January 18, 2007, Plaintiff received second injection at L4-5 on her right side.  (Tr. at 313.)  Dr. Anderson also prescribed methadone[14] in order to reduce Plaintiff's use of "an excessive amount of Percocet" and baclofen[15] for muscle relaxation.  (Tr. at 294, 314.)

---

[13] Neurontin is a band name for gabapentin and "is used to help control certain types of seizures in patients who have epilepsy. Gabapentin is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles)."  *Gabapentin*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited June 21, 2011).

[14]
          Methadone is used to relieve moderate to severe pain that has not been relieved
          by non-narcotic pain relievers. It also is used to prevent withdrawal symptoms in
          patients who were addicted to opiate drugs and are enrolled in treatment
          programs in order to stop taking or continue not taking the drugs.

Plaintiff began physical therapy with MAPS on January 19, 2007.  (Tr. at 305.)  Plaintiff reported that "[h]er pain is mostly on the right mid back and low back with radiation into the right buttock."  (Tr. at 305.)  On a scale of 1 to 10, Plaintiff described her pain as a 6-7 with medication and a 9-10 without medication.  (Tr. at 305.)  Plaintiff also stated that she was "supposed to start school in the spring."  (Tr. at 305.)  Plaintiff's Oswestry score was 58/100.[16] (Tr. at 305.)  Plaintiff's straight leg raising test results were "90 degrees on the right and negative, 85 degrees on the left and negative."[17]  (Tr. at 306.)  Plaintiff's physical therapist, Heather Southam, L.P.T., assessed Plaintiff "as having Thoraco-lumbar radiculopathy[18] with associated: weakness of parascapular musculature, decreased postural awareness, weakness of spinal stabilizing musculature, and decreased functional endurance.  [Plaintiff] presents with

---

*Methadone*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000591/ (last visited June 21, 2011).

[15] "Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle movement." *Baclofen*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000702/ (last visited June 21, 2011).

[16]

> The Oswestry Low Back Pain Disability Index utilizes a patient questionnaire which contains six statements (denoted by the letters A through F) in each of ten sections.  The questions concern impairments like pain, and the ability to cope with such things as personal care, lifting, reading, driving, and recreation.  For each section, the patient chooses the statement that best describes their status.  The designers of the test interpret "percentage of disability" scores in this manner: 0% to 20%- minimal disability; 20% to 40%-moderate disability; 40% to 60%-severe disability; 60% to 80%-crippled; and 80% to 100%-bed bound (or exaggerating symptoms).

*MacDonald*, 2007 WL 1051507, at *2 n.4.

[17]

> The straight leg raising test . . . , which is performed by raising the lower extremity and dorsiflexing the foot, is classically associated with the reproduction of ipsilateral radicular pain secondary to nerve root compression by a herniated lumbar disc, presumably by stretching the compressed ipsilateral nerve root.  The test result is positive when pain is produced. Most patients with a true positive straight leg raising sign complain of excruciating sciatica-like pain in the leg at 30 to 40 degrees of elevation.

*Id.*, at *2 n.3.

[18] "Radiculopathy refers to any disease that affects the spinal nerve roots." *Herniated Disk*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited July 17, 2011).

chronic back low back pain.  She has some weakness in her gluts and abdominals."  (Tr. at 306.)

Southam concluded that Plaintiff "would benefit from a spinal stabilization exercise program"

and that Plaintiff "also has some hypomobility in the lumbar spine which would benefit from

manual therapy."  (Tr. at 306.)   Southam recommended that Plaintiff be seen 1 to 2 times per

week for the next 10 to 12 weeks, for a total of 13 visits.  (Tr. at 307.)

On January 23, 2007, Plaintiff was seen at HCMC for back pain.  (Tr. at 237.)  Plaintiff

reported that she had been having back pain radiating down to her right ankle since

Thanksgiving 2006.  (Tr. at 237.)   Plaintiff indicated that her pain was "a little bit better

controlled with all the pain medications currently."  (Tr. at 237.)  Plaintiff was directed to return

the following week with her MRI.  (Tr. at 237.)  Plaintiff returned on January 30, 2007, bringing

the previous MRI.  (Tr. at 236.)  She reported that physical therapy was not helping her back

pain.  (Tr. at 236.)  Eunkyung Won, M.D., reviewed the MRI and observed that Plaintiff "has a

bulging disc at the L4-5 region, however this is fairly mild and does not impinge on any nerve

roots and does not correlate with [Plaintiff's] symptoms."  (Tr. at 236.)   Dr. Won opined that

Plaintiff's pain would not likely be helped by surgical decompression and recommended that she

continue visiting MAPS.  (Tr. at 236.)

Plaintiff had her second physical therapy appointment on January 26, 2007.  (Tr. at 304.)

Plaintiff told Southam that she had been doing the exercises at home and wanted to try downhill

skiing.  (Tr. at 304.)  Southam reported that Plaintiff had "pain in the right SI joint area with left

side flexion, with extension" and "appear[ed] left rotated in the lumbar spine, with hypomobility

at L2/3 bilaterally," and that "[a] scoliotic curve [was] present with doing extension of the

lumbar spine."  (Tr. at 304.)

Plaintiff had another physical therapy appointment on February 1, 2007.  She stated that "[s]he ha[d] misplaced the exercise sheets" and had not done her exercises.  Plaintiff had "pain in the mid lower back and in the right buttock" and rated her pain a 7 on a scale of 1 to 10.  (Tr. at 303.)  Southham observed that Plaintiff "appear[ed] left rotated in neutral and extension"; "ha[d] decreased inferior glide of the right L3/4"; had a negative SI kinetic test; and was "tight and tender upon palpation to the right glut/piriformis."  (Tr. at 303.)

The same day, Plaintiff went to MAPS for a third lumbar epidural steroid injection at the right L4-L5, stating that the previous epidural at L4 "very helpful."  (Tr. at 308, 310.)  Plaintiff was described as "known to have degenerative changes of the lower lumbar spine as well as facet arthropathy."[19]  (Tr. at 310.)  Plaintiff stated she had "pain in low back, radiating into the right lower extremity, mainly the thigh" as well as "some thoracic pain but the low back pain is the worst area."  (Tr. at 310.)  Plaintiff was observed to "move[] easily from [a] chair to [a] standing position"; was "tender to palpation at the L4 level over the spin and paraspinally"; had "good range of motion"; and was "ambulating normally."  (Tr. at 311.)  MAPS also discontinued Plaintiff's methadone prescription based on side effects she was experiencing and prescribed a Duragesic patch.[20]  (Tr. at 311.)

When Plaintiff returned to physical therapy on February 5, 2007, she reported that she was feeling better and that her back pain had decreased.  (Tr. at 302.)  At her next appointment on February 7, 2007, Plaintiff was "doing pretty good," but reported having some mid/upper back pain and groin pain which had decreased overnight.  (Tr. at 301.)

---

[19] Facet arthropathy is "[a]n inflammatory condition of the facet joint of the back and neck due to arthritis or other inflammatory condition of the spine."  *Facet Arthropathy*, HOSP. FOR SPECIAL SURGERY, http://www.hss.edu/condition-list_facet-arthropathy.asp (last visited June 22, 2011).
[20] The Duragesic patch a brand name for a fentanyl skin patch, which is "used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications."  *Fentanyl Transdermal*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000151/ (last visited June 22, 2011).

On February 8, 2007, Plaintiff was seen by MAPS for complaints regarding the Duragesic patch. (Tr. at 299.) Plaintiff reported that the patch was generally helpful, but less effective on the third day. MAPS did not increase her Duragesic prescription, but did increase the Neurontin. (Tr. at 300.) Plaintiff was observed to "move[] easily from chair to standing position; "ha[d] good range of motion in the extremities"; was "ambulating normally"; and had "mild tenderness remaining at the L4-5. (Tr. at 300.)

When Plaintiff attended physical therapy on February 21, 2007, she told Southam that she had overdone it at the gym and started having pain in her left anterior hip and right mid back. (Tr. at 377.) Southam worked on a series of stretching exercises with Plaintiff and noted that no new exercises were added because Plaintiff "has not been doing the exercises given [that] she could not recall them." (Tr. at 377.)

The following day, Plaintiff attempted to get another epidural injection, but was told that she would need to wait three months since she already had three injections during the month of February. (Tr. at 376.) Plaintiff continued physical therapy on February 23 and 28, 2007. (Tr. at 374-75.) On February 28, she reported that she had some aching in the lower left portion of her back, but otherwise felt "pretty good" and rated her pain a 4 on a scale of 1 to 10. (Tr. at 374.) Plaintiff did, however, report having an increase in back spasms. (Tr. at 374.)

Plaintiff saw Dr. Langsten on March 6, 2007, at which time she reported that she was "doing okay," but "is still having a lot of back pain." (Tr. at 404.) Plaintiff again appeared "somewhat anxious," but "was fully oriented, coherent, and relevant" and "[t]here was no evidence of suicidal ideation or psychotic symptoms." (Tr. at 404.) Dr. Langsten's diagnoses of Plaintiff's mental health was: "Major Depressive Disorder, Recurrent, Versus Atypical Depressive Disorder, Stable; Posttraumatic Stress Disorder, Chronic or Complex Type; Bipolar

Disorder, NOS, By History; Polysubstance Abuse/Dependence, In Full Remission, In A Treatment Setting; and Borderline Personality Disorder, By History." (Tr. at 404-05.)

Plaintiff had a follow-up session with MAPS on March 22, 2007. (Tr. at 372-73.) Plaintiff reported that she was walking more and Plaintiff's medical records indicate that her pain ratings were improving from her previous visits. (Tr. at 372.)

Plaintiff was seen at Hennepin Faculty Associates (HFA) on April 9, 2007, for back pain in the L5-S1 region, which was more persistent on the right side, but also travelled to the front and left side. (Tr. at 354.) Plaintiff told her provider that "[w]alking helps the pain while prolonged sitting makes it worse" and that "[h]eat helps." (Tr. at 354.) Plaintiff was given acupuncture and deep breathing exercise. (Tr. at 354; *see* Tr. at 355.)

Plaintiff had an additional acupuncture treatment at HFA on April 16, 2007. (Tr. at 354.) Plaintiff stated that "she felt calmer/relaxed and had a decrease in pain" after her last treatment and that the breathing techniques helped with her pain. (Tr. at 354-55.) Plaintiff reported that she felt "instant relief in the related disc area" after the April 16 treatment. (Tr. at 355.)

Plaintiff had another follow-up visit with MAPS on April 23, 2007. (Tr. at 370-71.) Plaintiff reported that her pain was a 6 on a scale of 1 to 10 and that she believed her medications were helping. (Tr. at 370.) Plaintiff also reported that she was moving to an apartment with her boyfriend and that she was going to be doing bookwork for her brother's construction business. (Tr. at 370.)

On May 22, 2007, Plaintiff returned to MAPS for another lumbar epidural steroid injection at L4-5 on the right side. (Tr. at 368.) Plaintiff's medical records also indicate that she was taken off the Duragesic patch after having "an abnormal urine screen for drugs of abuse," and was back on methadone and in a treatment program. (Tr. at 369.)

Plaintiff received additional acupuncture treatment for back and hip pain on May 25 and 30 and on June 8 and 15, 2007. (Tr. at 355-58.) On June 19, 2007, she returned to MAPS complaining of "pain in the right hip and buttocks region" and tenderness. (Tr. at 367.) Plaintiff reported that the lumbar epidural steroid injections had decreased her pain, but that the pain in her right hip and buttocks persisted. (Tr. at 367.) Plaintiff was given trigger point injections in this area. (Tr. at 367.) Plaintiff received an additional acupuncture treatment on August 3, 2007, and reported that acupuncture was helping her pain and that her pain was worse with stress. (Tr. at 358.)

On August 9, 2007, Plaintiff had an appointment with Dr. Langsten. (Tr. at 434.) Plaintiff told Dr. Langsten that she "has had a difficult time," stating that she had to leave the shelter because she got into a fight with another resident and a roommate of hers overdosed and was now in the hospital. (Tr. at 434.) Plaintiff's anxiety, cognitive functions, judgment, insight, lack of suicidal ideation or psychotic symptoms, and motivation for treatment remained the same. (Tr. at 434.) At this time, Dr. Langsten assessed Plaintiff as having Major Depressive Disorder, Recurrent, vs. Atypical Depressive Disorder, with Recent Exacerbation of Symptoms; Posttraumatic Stress Disorder, Chronic; Bipolar Disorder, NOS, by History; Polysubstance Abuse/Dependence, in Remission, According to Patient Report; and Borderline Personality Disorder. (Tr. at 434.)

Plaintiff continued receiving acupuncture treatments for back and hip pain throughout November 2007. (Tr. at 441-43.) She reported that standing and stress made her pain worse, but that acupuncture made the pain dissipate. (Tr. at 441-43.) Plaintiff consistently reported that her pain was a 6 on a scale of 1 to 10. (Tr. at 441-43.)

On November 29, 2007, Plaintiff saw a chiropractor, Richard Printon, D.C., through HFA. (Tr. at 443.) Dr. Printon observed that Plaintiff had "decreased thoracic kyphosis and decreased lumbar lordosis,"[21] and noted that Plaintiff had "[m]oderate loss of lumbar extension with increased pain with extension movement initially and decreasing pain with repeat extension especially prone extension, centralization." (Tr. at 443-44.) Dr. Printon recommended that Plaintiff return two times per week for treatment. (Tr. at 444.)

Throughout the end of November, the month of December, and early January 2008, Plaintiff made regular visits to her acupuncturist and chiropractor. (Tr. at 442-49.) She consistently reported to her acupuncturist that her current pain was between a 5 and a 6; her pain over the two weeks prior to each appointment was between a 6 and a 7; and that her pain was better with acupuncture and chiropractic care and worse with stress. (Tr. at 442-49.) Plaintiff initially reported minor improvement to her chiropractor (Tr. at 445), but subsequently experienced pain in her left elbow after "carrying a lot of objects." (Tr. at 446.) On December 23, Plaintiff told Dr. Printon that she had sought emergency treatment for pain relief and had pain in her right buttock and hip. (Tr. at 449.) Plaintiff also reported that "she is very busy with trying to move and get her life together." (Tr. at 449.) Over this period of time, Dr. Printon

---

[21]

The spine has three types of curves:

- Kyphotic curves refer to the outward curve of the thoracic spine (at the level of the ribs).
- Lordotic curves refer to the inward curve of the lumbar spine (just above the buttocks).
- Scoliotic curving is a sideways curvature of the spine and is always abnormal.

A small degree of both kyphotic and lordotic curvature is normal. Too much kyphotic curving causes round shoulders or hunched shoulders (Scheuermann's disease).

Too much lordotic curving is called swayback (lordosis). Lordosis tends to make the buttocks appear more prominent.

*Lordosis*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003278.htm (lasted visited July 5, 2011).

noted that Plaintiff had "[w]eakness of the rhomboid muscles and very strong pectoralis muscles and slight rounded shoulders" and "[m]inimal loss of lumbar extension movement and CT [cervical thoracic] retraction and extension."  (Tr. at 445-46.)  On December 23, Dr. Printon observed that Plaintiff had "decreased thoracic kyphosis [a]nd normal lordosis."  (Tr. at 449.)

   4.  <u>**2008**</u>

On January 15, 2008, Plaintiff visited Elena L. Polukhin, M.D., for the "[e]valuation of [her] rehabilitation potential and designing [a] comprehensive outpatient rehabilitation program for pain management and functional enhancement focused on the osteoarthritis and low back treatment and rehabilitation."  (Tr. at 450.)  Plaintiff's chief complaints were: "[l]ow back pain radiating to both legs"; "[b]ilateral knee pain"; "[h]ip pain"; "[s]houlder pain"; and "[d]ifficulty with ambulation."  (Tr. at 450.)  Plaintiff told Dr. Polukhin that "she experiences continuous major joint arthralgia,[22] limitations in active and passive [range of motion], occasional flairs that affect ability to ambulate, and limits independence in activities of daily living."  (Tr. at 450.) Plaintiff also told Dr. Polukhin that her application for SSI had been denied.  (Tr. at 451.)  Dr. Polukhin's notes from this visit indicate that she had a "detailed conversation" with Plaintiff regarding her SSI application and that Dr. Polukhin "promised to support SSI application."  (Tr. at 453.)

Dr. Polukhin noted that Plaintiff had "a long-standing history of low back pain, polysubstance abuse and generalized osteoarthritis."  (Tr. at 450.)  Dr. Polukhin also noted that Plaintiff had been seen by multiple medical providers, tried various anti-inflammatory medications, physical therapy, and chiropractic care, and ultimately withdrew from these programs.  (Tr. at 450.)  Dr. Polukhin observed that the examination "demonstrated decreased

---

[22] Arthralgia is joint pain.  *Joint Pain*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003261.htm (last visited July 5, 2011).

[range of motion] in major joints, especially in the knees, shoulders, and ankles." (Tr. at 452.) Dr. Polukhin gave Plaintiff a caudal steroid epidural injection. (Tr. at 452.) Among other things, Dr. Polukhin recommended additional testing, physical therapy, massage, acupuncture, mood stabilization, and treatment of Plaintiff's other existing conditions per her doctors' recommendations. (Tr. at 453.)

Plaintiff saw both Dr. Printon and Dr. Langsten on January 25, 2008. (Tr. at 453-54, 432-33.) In her chiropractic session, Plaintiff continued reporting pain in her lower back and right lower leg. (Tr. at 453.) Dr. Printon observed that Plaintiff had "[m]inimal loss of [range of motion] in extension, CT retraction and extension and weakness of thoracic paraspinal muscles" as well as "[m]inor weakness of the glutes . . . ." (Tr. at 454.) He recommended that Plaintiff continue to return for chiropractic treatment once a week. (Tr. at 454.)

When visiting Dr. Langsten, Plaintiff told him that "she is doing okay" and that she was "on a Methadone program because she was going through a pain management program called MAPS(?) [sic] and ended up on pain killers that she got addicted to." (Tr. at 432.) Plaintiff also reported that she was having difficulty sleeping and asked to change her medication. (Tr. at 452.) In addition, Plaintiff asked Dr. Langsten "about medication for ADHD because she is having trouble concentrating." (Tr. at 432.) Because of Plaintiff's concerns over "taking anything that might be addicting or a substance that could be abused," Dr. Langsten recommended some therapy options. (Tr. at 432.) In his treatment notes, Dr. Langsten made the same observations concerning Plaintiff's anxiety, cognitive functions, judgment, insight, lack of suicidal ideation or psychotic symptoms, and motivation for treatment. (Tr. at 432.) Dr. Langsten assessed Plaintiff as having "Atypical Depressive Disorder, Versus Major Depressive Disorder, By History; Posttraumatic Stress Disorder, Chronic; History of being diagnosed with

16

Bipolar Disorder, NOS; Polysubstance Abuse/Dependence, In Full Remission, According to Patient Report; and Borderline Personality Disorder (primary diagnosis)."  (Tr. at 432.)

Plaintiff had an additional acupuncture treatment on February 21, 2008, where she reported that her pain was a 6 out of 10 and that acupuncture and chiropractic care helped alleviate her pain whereas stress increased it.  (Tr. at 455.)

Plaintiff returned to Dr. Polukhin on February 26, 2008.  (Tr. at 458.)  In addition to knee pain, hip pain, and difficulty with ambulation, Plaintiff reported having neck pain that radiated to both of her arms.   (Tr. at 459.)  Dr. Polukhin observed that Plaintiff had "decreased [range of motion] in major joints especially in the knees, shoulders, and ankles."  (Tr. at 460.)  Dr. Polukhin administered trigger point injections to Plaintiff's trapezius, praspinals, levater scapula, and occipitalis muscles.  (Tr. at 460.)  The same day, Plaintiff began physical therapy with Elaine Ito.  (Tr. at 455.)  Plaintiff reported that her pain was 5 out of 10; better with "moving and walking"; and worse with "prolonged positioning" and "heavy lifting."  (Tr. at 456.)  Ito determined that Plaintiff had "myofascial dysfunction"[23] and "lumbar dysfunction."  (Tr. at 457.)  Ito's treatment goals were to "[d]ecrease pain levels on a daily pain scale to 3-5/10 in 4 weeks"; [i]ncrease tolerance for [activities of daily living] by 10-20% in 6-8 weeks"; and "[i]mprove soft tissue/myofascial tone in lumbar area for pain reduction in 4-6 weeks."  (Tr. at 457.)

On March 4, 2008, Plaintiff entered Park Avenue Center's Women's Outpatient Program for substance use.  (Tr. at 422.)  At the time she began the program, Plaintiff "reported a mental health diagnosis depression, ADHD and PTSD."  (Tr. at 423.)  Plaintiff also reported that she

---

[23] See *Myofascial Pain Syndrome*, MAYO CLINIC, http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042 (last visited July 17, 2011) (describing myofascial pain as a form of muscle pain, which "centers around sensitive points in your muscles called trigger points.  The trigger points can be painful when touched.  And the pain can spread throughout the affected muscle.").

"was compliant" with all of her prescribed medications.  (Tr. at 423.)  Plaintiff was discharged from the program on April 3, 2008.  (Tr. at 422.)

During the time she was in treatment, Plaintiff continued visiting her acupuncturist.  In these weekly visits, Plaintiff reported having pain in her low back, left hip, shoulder, and neck areas.  (Tr. at 641-64.)  She described the pain as a 5 out of 10 and reported that chiropractic are and acupuncture helped manage the pain, and that her pain was worse with damp cold and stress.  (Tr. at 461-64.)

Plaintiff had her next physical therapy appointment with Ito on March 21, 2008.  (Tr. at 464.)  Plaintiff reported that her overall pain was a 6 out of 10, but stated her neck and shoulders were an 8 out of 10.  (Tr. at 464.)  Ito's notes indicate that Plaintiff reported that "her pain pattern is changing" and that she was experiencing "pain in new places."  (Tr. at 464.)

Plaintiff visited Dr. Langsten on March 28, 2008.  (Tr. at 431.)  Plaintiff reported that acupuncture and physical therapy were helping with her back pain.  (Tr. at 431.)  Plaintiff also told Dr. Langsten that "her counselor at the Methadone Program suggests that she get a referral for neuropsychological testing to rule out ADHD."  (Tr. at 431.)  Dr. Langsten's notes indicate that he gave Plaintiff a referral letter, but also suggested that Plaintiff "look into the subject more *since her primary problem appears to me to be anxiety and a primary brain dysfunction.*"  (Tr. at 431 (emphasis added).)  No changes were reported with regard to Plaintiff's mental status.  (Tr. at 431.)

On April 1, 2008, Plaintiff had an appointment with Dr. Polukhin, but she did not appear.  (Tr. at 465.)  Plaintiff did, however, visit Kara L. Parker, M.D., for counseling on nutrition and supplementation for pain and mood stabilization.  (Tr. at 466.)  Dr. Parker observed that Plaintiff

"[m]oves easily and sits comfortably."  (Tr. at 466.)  Dr. Parker forwarded her notes to Dr. Polukhin.  (Tr. at 466.)

Plaintiff had three additional acupuncture treatments during the month of April 2008. (Tr. at 467-68.)  Plaintiff continued reporting that she was experiencing neck, shoulder, low back, and hip pain; her pain was a 5 out of 10; and her pain was better with acupuncture and chiropractic care and worse with stress, overuse, and cold/damp weather.  (Tr. at 467-68.)

Plaintiff next saw Dr. Polukhin on May 9, 2008.  (Tr. at 470.)  Plaintiff reported having pain in her neck and back as well as muscle spasms in these areas.  (Tr. at 470.)  Plaintiff also complained of poor mood, irritability, insomnia, and difficulty with ambulation.  (Tr. at 470.) The issue of Plaintiff's SSI application was also discussed.  (Tr. at 470-71.)  Dr. Polukhin noted that "[w]hen [she] asked about [Plaintiff's] psych meds, [Plaintiff] became angry, confrontational, and started screaming . . . ."  (Tr. at 470.)  Dr. Polukhin subsequently changed the subject and recommended that Plaintiff update her medical records.  (Tr. at 470-71.)

Plaintiff continued seeing her acupuncturist approximately once per week during the month of May 2008.  (Tr. at 468-69, 473.)  Plaintiff's symptoms and pain level remained unchanged as compared to the prior month's visits with the exception of midback pain, which Plaintiff reported on May 12, 2008.  (Tr. at 468-69, 473.)

Plaintiff underwent neuropsychology testing for attention deficit disorder as recommended by Dr. Langsten on June 16, 2008.  (Tr. at 493.)  Paul S. Marshall, Ph.D., reviewed Plaintiff's test results and wrote a summary report on July 17, 2008.  (Tr. at 493, 504.) Dr. Marshall observed that Plaintiff's "[p]erformances on tests of attention were variable."  ("Tr. at 493.)  Among other things, Dr. Marshall wrote that Plaintiff "exhibited severe deficits in sustaining visual attention over longer periods of time as her response times were unusually

variable, she made many omission errors, and her performance in general deteriorating over time on the longest test of sustained attention in the test battery."  (Tr. at 493.)   However, Dr. Marshall opined that Plaintiff's performance on this test "was indicative of *feigning of sustained attention deficits*." (Tr. at 493 (emphasis added).)  Dr. Marshall stated that while Plaintiff's self-reporting responses and results of some tests suggest that Plaintiff meets the criteria for adult attention deficit disorder, the ADHD tests called into question the validity of Plaintiff's responses and Plaintiff "appeared to be feigning sustained attention deficits on the test most commonly associated with [attention deficit disorder] assessment."  (Tr. at 494.)  Dr. Marshall also observed that "the  report of the onset of her attention problems in her initial interview is not consistent with the [attention deficit disorder]," (Tr. at 494); Plaintiff "checked off frequently experiencing a number of behaviors that are not, in fact, indicative of having attention deficit disorder," (Tr. at 501); and that Plaintiff's "response on the infrequency scale raises serious questions about the validity of her responses on all the other [attention deficit disorder] behavior rating scales in general,"  (Tr. at 501).   Dr. Marshall concluded that

> it appears unlikely that [Plaintiff] has [ADHD] secondary to irregularities in the balance between arousal and inhibition systems.  Given [Plaintiff's] history of severe polysubstance abuse (including stimulant abuse), it would appear unwarranted and unwise [to] prescribe [attention deficit disorder] medications.  On the other hand, it does appear as if [Plaintiff] has very mild prefrontal cortex dysfunction that is most likely due [to] the combined adverse effects of severe alcohol, cocaine, and methamphetamine abuse of many years duration and/or fetal alcohol effect.

(Tr. at 494.)

Dr. Marshall indicated that Plaintiff "would be expected to have very mild difficulty in day to day functioning due to cognitive impairment"; Plaintiff "exhibits deficits in information processing (e.g., attention and working memory) which will interfere with the <u>acquisition</u> of

knowledge and skills"; and that "subtle deficits in the ability to effectively <u>employ</u> previously acquired knowledge (e.g., in planning, judgment, and abstraction) are also exhibited."  (Tr. at 501.)  Dr. Marshall opined that individuals like Plaintiff "often exhibit a limited ability to assume the perspective of another or to appreciate their viewpoint, a phenomenon that causes significant problems in their personal relationships" and that "[s]trained personal relationships could occur as a result of a diminished capacity to self-monitor behavior, control emotional responses, appreciate the impact of behavior on others, or to alter what is said to meet the social requirements of a situation."  (Tr. at 502.)  Dr. Marshall noted that "[i]mpaired performance of tests of working memory suggest that [Plaintiff] will have problems in a variety of important cognitive tasks: imitation of complex behavioral sequences, retrospective function (having hindsight), prospective function (having foresight), anticipating events, and organizing behavior across time."  (Tr. at 502.)  Plaintiff also "[e]xhibited cognitive deficits[, which] are apt to interfere with learning generally.  (Tr. at 503.)

Dr. Marshall made the following observations concerning potential employment implications:

> Visual attention deficits indicate that [Plaintiff] should not be allowed to operate heavy or potentially dangerous machinery. Attention deficits are apt to lead to a number of errors in executing tasks that would not be acceptable in many work situations.  From the standpoint of cognitive functioning alone, competitive employment (i.e., regular employment with no job modifications) is possible in a wide variety of situations where fully intact attention, abstract reasoning, and planning/organization abilities are not a critical factor.  However, a history of recurrent psychiatric and substance abuse related symptoms exacerbations apparently has made—and probably will continue to make—stable gainful employment impossible in the real competitive job market, even though [Plaintiff] may be able to work reasonable effectively with unusual levels of supervision during periods of remission.

(Tr. at 503.)

Plaintiff returned twice to her acupuncturist during the month of August 2008.  (Tr. at 474-75.)  Plaintiff's chief complaints were neck, shoulder, hip, low back, and heel pain.  (Tr. at 474-75.)  Plaintiff still ranked her pain as a 5 out of 10 and described it as "dull[,] burning[, and] constant."  (Tr. at 474-75.)  Plaintiff returned for two additional treatments in early September 2008.  (Tr. at 475-77.)

Plaintiff saw Dr. Langsten on August 18, 2008.  (Tr. at 429.)  The visit primarily focused on Plaintiff's difficulties sleeping and "alternative sleeping medications were discussed at length."  (Tr. at 429.)  Dr. Langsten assessed Plaintiff as having "Atypical Depressive Disorder, by History, Stable; Posttraumatic Stress Disorder, Chronic; history of being diagnosed with Bipolar Disorder, NOS; Polysubstance Abuse/Dependence, In Full Remission, According To Patient Report; and Borderline Personality Disorder (primary diagnosis).   Methadone maintenance."  (Tr. at 429.)  Dr. Langsten's notes continued to indicate that Plaintiff was anxious, but "fully oriented, coherent, and relevant"; had an appropriate affect as well as adequate judgment and insight; lacked any sign of suicidal ideation or psychotic symptoms; and was motivated for treatment.  (Tr. at 429.)

On September 19, 2008, Plaintiff had an electromyography[24] (EMG).  (Tr. at 536-38.) As a result of this study, Dr. Polukhin concluded that Plaintiff had "[p]eripheral polyneuropathy,[25] primarily demyelinating affecting motor and sensory nerves of both legs"[26] and "[l]eft sided S1 radiculopathy chronic."  (Tr. at 538.)

---

[24] An EMG is an electrodiagnostic test "that records and analyzes the electrical activity in [the] muscles" and "is used to learn more about the functioning of nerves in the arms and legs."  *Electrodiagnostic Testing* , AM. ACAD. ORTHOPAEDIC SURGEONS, http://orthoinfo.aaos.org/topic.cfm?topic=A00270 (last visited July 17, 2011).

[25] Peripheral neuropathy "is caused by nerve damage" and "often causes numbness and pain in [the] hands and feet. People typically describe the pain of peripheral neuropathy as tingling or burning  . . . ."  *Peripheral Neuropathy*, MAYO CLINIC, http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131 (last visited July 17, 2011).

[26] *See Demyelinating Disease: What Causes It?*, MAYO CLINIC, http://www.mayoclinic.com/health/demyelinating-disease/AN00564 (last visited July 17, 2011) (defining a "demyelinating disease" as "any condition that results in

Dr. Langsten next saw Plaintiff on October 20, 2008.  (Tr. at 428.)  Plaintiff reported having dreams involving her sister, who was killed in 2004, and asked about grief and loss therapy.  (Tr. at 428.)  Dr. Langsten's notes indicate that Plaintiff "also brought a form from her lawyer requesting information about her evaluation and treatment here."  (Tr. at 428.)  Dr. Langsten and Plaintiff "discussed holistic approaches to her anxiety and depression," and Dr. Langsten suggested a grief and loss therapy group.  (Tr. at 428.)  Dr. Langsten's observations concerning Plaintiff's mental status remained unchanged.  (Tr. at 428.)

Sometime between September 2008 and January 2009, Plaintiff had cervical dystonia neurotherapy/chemodenervation treatment through HFA.  (Tr. at 478-81.)  It is not clear from the record who the treatment provider was or when the treatment specifically occurred.  (*See* Tr. at 478-81.)  Plaintiff reported that, while her pain was improving with chiropractic care and pain medications, her symptoms were not entirely resolved and she continued "experiencing neck pain, muscle spasms, headache and functional decline, [and] emotional instability."  (Tr. at 478.)  During this visit, Plaintiff received Myobloc[27] injections on both the left and right sides of her neck and body.  (Tr. at 480-81.)

### 5.  <u>2009</u>

Plaintiff returned to for a follow-up visit with Dr. Polukhin on January 9, 2009.  (Tr. at 481.)  Plaintiff's chief complaints were still neck and back pain and muscle spasms as well as "[p]oor mood, irritability and insomnia."  (Tr. at 481.)  Plaintiff did note that she was "in a much better mood than before."  (Tr. at 481.)  Dr. Polukhin observed that Plaintiff appeared to be in a good mood at the time of the visit.  (Tr. at 481.)  Plaintiff and Dr. Polukhin talked about the

---

damage to the protective covering (myelin sheath) that surrounds nerve fibers in [the] brain and spinal cord," causing nerve impulses to slow or stop, and resulting in neurological problems").

[27] Myobloc is the brand name of a rimabotulinumtoxinB injection and "is used to relieve the symptoms of cervical dystonia (spasmodic torticollis; uncontrollable tightening of the neck muscles that may cause neck pain and abnormal head positions)."  *RimabotulinumtoxinB Injection*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608014.html (last visited July 5, 2011).

chemodenervation procedure and Dr. Polukhin noted that Plaintiff might be a good candidate for a repeat procedure.  (Tr. at 483.)   Plaintiff's SSI application was again discussed in detail, including the "necessity of straightening [Plaintiff's] medical records."  (Tr. at 482.)   Dr. Polukhin promised to support Plaintiff's application.  (Tr. at 483.)

Plaintiff followed up with Dr. Polukhin again on February 2, 2009.  (Tr. at 508.)   Dr. Polukhin's notes indicate that she and Plaintiff "have been discussing the pertinent issues related to the SSI application and necessity of straightening of her medical records.  In order to avoid further confrontation and decrease the chance of violence I changed the topic and recommended to update her medical records."  (Tr. at 508.)  Dr. Polukhin observed "cracking and a certain limitation in active and passive [range of motion] in knees, hips, and ankles."  (Tr. at 509.)

On February 12, 2009, Plaintiff had a medication management appointment with Dr. Langsten.  (Tr. at 511.)  Plaintiff and Dr. Langsten discussed her treatment, including the risks, benefits, and potential side effects of Plaintiff's medication.  (Tr. at 512.)  Dr. Langsten noted that Plaintiff had begun to see a therapist and he recommended a book for her to read.  (Tr. at 512.)  Plaintiff's mental status remained unchanged.  (Tr. at 486.)  On February 24, 2009, however, Plaintiff called HCMC and reported that she had two episodes of sleepwalking.  (Tr. at 485.)   As a result, Dr. Langsten discontinued Plaintiff's prescription for Rozerem[28] and suggested that Plaintiff be referred to a sleep study, noting that Plaintiff has tried several sleep medications without success.  (Tr. at 485.)

Plaintiff had follow-up visits with Dr. Polukhin on March 2, April 2, and May 5, 2009. (Tr. at 512, 515, 518.)   Plaintiff's chief complaints continued to be neck and back pain and muscle spasms, poor mood, irritability and insomnia.  (Tr. at 512, 515, 518-19.)  Plaintiff and Dr.

---

[28] Rozerem is a brand name for ramelteon, a medication that "is used to help patients who have sleep-onset insomnia (difficulty falling asleep) fall asleep more quickly."  *Ramelton*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605038.html (last visited July 5, 2011).

Polukhin also continued to discuss Plaintiff's application for SSI.  (Tr. at 513-14.)  On April 2, Plaintiff had a second cervical dystonia neurotherapy/chemodenervation treatment.  (Tr. at 515-18.)  During the physical exam, Dr. Polukhin observed that Plaintiff 's

> [n]eck was rigid. . . . There were signs of significant cervical dystonia[29] bilaterally.    Symptoms    included    involuntary contracting of the neck muscles, causing abnormal movements and awkward posture of the head and neck.   The movements were sustained ("tonic"), jerky ("clonic"), sometimes there was a combination of different abnormal muscles [sic] movements. Cervical [range of motion] was limited because of pain and muscle contractions.  Cervical dystonia resulted in considerable pain and discomfort.

(Tr. at 515-16.)  During Plaintiff's May 5 visit, Dr. Polukhin's notes indicate that Plaintiff is "doing better and she is happy with about her progress."  (Tr. at 519.)

Plaintiff had an additional medication management appointment with Dr. Langsten on April 21, 2009.  (Tr. at 533.)  Dr. Langsten noted that Plaintiff had been taking three 15 mg capsules of Restoril[30] per night, instead of the prescribed one capsule; Dr. Langsten advised Plaintiff not to take more than two capsules per night.  (Tr. at 533.)  He also noted that Plaintiff had an upcoming appointment at the HCMC sleep clinic.  (Tr. at 533.)  During this visit, Plaintiff reported "that her situational stress has increased because her partner lost his job and so they are under a lot of financial pressure."  (Tr. at 533.)  Dr. Langsten "counseled [Plaintiff] in relaxation and breathing exercises and other techniques to manage her anxiety" and again referred Plaintiff to the book he previously recommended.  (Tr. at 534.)  Dr. Langsten's assessment of Plaintiff's condition remained unchanged.  (Tr. at 533-34.)

---

[29] "Cervical dystonia, also called spasmodic torticollis, is a painful condition in which [the] neck muscles contract involuntarily, causing [the] head to twist or turn to one side.  Cervical dystonia can also cause [the] head to uncontrollably tilt forward or backward." *Cervical Dystonia*, MAYO CLINIC, http://www.mayoclinic.com/health/spasmodic-torticollis/DS00836 (last visited July 17, 2011).

[30] Restoril is the brand name for temazepam, a medication "used on a short-term basis to treat insomnia (difficulty falling asleep or staying asleep)." *Temazepam*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684003.html (last visited July 6, 2011).

### C.  SSI-Related Examinations & Assessments

At the Commissioner's request, a consultative examination was performed by Alford Karayusuf, M.D., on April 13, 2007.  (Tr. at 316.)  Plaintiff told Dr. Karayusuf that her chief complaints were back pain, ADHD, the effects of fetal alcohol syndrome, and reading comprehension.  (Tr. at 316.)  Plaintiff reported on her history of back pain, drug and alcohol abuse, and depression.  (Tr. at 316.)   Plaintiff indicated that she had been diagnosed with "with bulging discs at L5 and S1 and degenerative disc disease," and described the pain as "persistent, aching, and aggravated further by bending, twisting, stooping, reaching, lifting, squatting, standing too long, walking too long, and lying down too long."[31]  (Tr. at 316.)  Plaintiff had "slight improvement" with her medications, but was becoming tolerant and the doses needed to be increased.  (Tr. at 316.)   Plaintiff told Dr. Karayusuf that "[s]he has been struggling with depression for years"; is anxious and worries; uses medication to treat panic attacks "that occur whenever she is in a crowded situation such as a shopping mall or crowded grocery store or crowded elevator"; and is distracted and unfocused.  (Tr. at 317.)

Plaintiff told Dr. Karayusuf that she has resided at Mission Lodge, a chemical dependency program, since July 2006; she has four roommates, three of whom she gets along with.  (Tr. at 317.)  Plaintiff does not do any cooking, grocery shopping, or dish washing as these chores are done for residents.  (Tr. at 317.)  Plaintiff's boyfriend does her laundry for her.  (Tr. at 317.)  Plaintiff spends several hours a day with her boyfriend; watches television for three hours a day; attends AA meetings four or five times per week and speaks up at meetings; visits with her AA sponsor once a week; and plays cards one or twice per week.  (Tr. at 317.)

Dr. Karayusuf observed that Plaintiff's recent and remote memory were intact; Plaintiff was of average intelligence and fair insight; and Plaintiff had difficulty trusting others.  (Tr. at

---

[31] Dr. Karayusuf did not have any medical reports available at the time of the interview.  (Tr. at 316.)

318.)  Dr. Karayusuf also observed that Plaintiff "was restless and physically uncomfortable and could not sit still due to the need to keep changing positions due to her chronic pain."  (Tr. at 318.)  Dr. Karayusuf diagnosed Plaintiff with polysubstance dependence, in remission; major depression, recurrent, moderate; and antisocial personality traits.  (Tr. at 318.)  Dr. Karayusuf ultimately concluded that Plaintiff "is able understand, retain and follow simple instructions. She is restricted to work that involves brief, superficial interactions with fellow workers, supervisors and the public.  Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, she is able to maintain pace and persistence."  (Tr. at 318.)

On April 18, 2007, Ray M. Conroe, Ph.D., L.P., reviewed Plaintiff's file as maintained by the Commissioner and performed both the "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment."   (Tr. at 319, 333, 335.)   *See* 20 C.F.R. § 416.945(a)(1), (b), (c) (defining "residual functional capacity" as the most a claimant can do despite his or her limitations, including both physical and mental abilities of the claimant). Following the psychiatric review, Dr. Conroe opined that Plaintiff's mental disorders had a mild restriction on her daily living activities and moderate restrictions on her social functioning and ability to maintain concentration, persistence or pace.  (Tr. at 329.)  As a result, Dr. Conroe concluded that Plaintiff "has a severe impairment that does not meet or equal listings."  (Tr. at 331.)  Dr. Conroe's conclusions for mental residual functional capacity were as follows:

> [Plaintiff] retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but would be markedly impaired for detailed or complex/technical instructions.
>
> [Plaintiff's] ability to carry out routine, repetitive and 3-4 step tasks with adequate persistence and pace would not be

significantly limited, but would be markedly limited for detailed or complex/technical tasks.

[Plaintiff's] ability to handle co-worker and public contact would be reduced but adequate to handle brief and superficial contact.

[Plaintiff's] ability to handle supervision would be res[t]ricted secondary to reduced stress tolerance but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings.

[Plaintiff's] ability to handle stress and pressure in the work place would be reduced but adequate to handle the stresses of a routine repetitive or a 3-4 step work setting.  It would not be adequate for the stresses of a detailed or complex work setting.

(Tr. at 335.)

Howard Atkin, M.D. performed a Physical Residual Functional Capacity Assessment of Plaintiff based on the Commissioner's file on May 21, 2007.  (Tr. at 41, 337, 344.)  Dr. Atkin diagnosed Plaintiff with "[l]umbar [d]isk [sic] [d]isease at L4-5," and observed that Plaintiff's epidural steroid injection had given her some relief; Plaintiff had "a normal gait"; and Plaintiff did not have any "weakness or numbness in the lower extremities."  (Tr. at 337-38.)   As for Plaintiff's exertional limitations, Dr. Atkin opined that she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk approximately six hours in an eight-hour day, with normal breaks; and sit for approximately six hours in an eight-hour day, with normal breaks.  (Tr. at 338.)  Dr. Atkin opined that Plaintiff had no additional limitations on the extent that she could push and/or pull, other than the prior lifting and carrying restrictions. (Tr. at 338.)   As for Plaintiff's postural limitations, Dr. Atkin concluded Plaintiff could frequently climb ramps and stairs, balance, and kneel, whereas she could only occasional climb ladders, ropes, and scaffolds, stoop, crouch, or crawl.  (Tr. at 339.)  Dr. Atkin believed Plaintiff's symptoms were attributable to a medically determinable impairment, appropriate in severity and

duration, and consistent with the evidence regarding Plaintiff's daily living activities.  (Tr. at 342.)

Plaintiff's file was reviewed along with additional psychological medical evidence of record by James M. Alsdurf, Ph.D., L.P., on August 30, 2007; Dr. Alsdurf affirmed the assessment of Dr. Conroe.  (Tr. at 413-14.)   The same day, Dan Larson, M.D., reviewed Plaintiff's file along with the additional medical evidence of record and concluded that the evidence did not further reduce Dr. Atkin's light residual-functional-capacity determination.  (Tr. at 416-17.)

On October 20, 2008, Dr. Langsten completed a questionnaire addressing Plaintiff's mental ability to do work-related activities.  (Tr. at 424-26.)  Regarding Plaintiff's ability to do unskilled work, Dr. Langsten observed that Plaintiff was able to sense normal hazards and respond appropriately and was limited but could satisfactorily understand, remember, and carry out short and simple instructions, and make simple work-related decisions.  (Tr. at 425.)  Dr. Langsten observed that Plaintiff was seriously limited in but not precluded from maintaining her attention for two hours at a time; maintaining her attendance and punctuality; sustaining an ordinary routine without special supervision; working closely without others without being unduly distracted; performing at a consistent pace; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism; getting along with coworkers; responding appropriately to changes within a routine work setting; and dealing with work stress.  (Tr. at 425.)  Dr. Langsten concluded that Plaintiff was unable to meet competitive standards for remembering work-like procedures.  (Tr. at 425.)   Dr. Langsten noted that Plaintiff's "anxiety symptoms and mood instability continuously interfere with her capacity to work."  (Tr. at 425.)  When asked to evaluate Plaintiff's ability to do semiskilled and skilled

work, Dr. Langsten concluded that Plaintiff's "anxiety and mental instability seriously limit her capacity to work and result in inability to meet competitive standards." (Tr. at 426.) As for specific skills and aptitudes, Dr. Langsten opined that Plaintiff was unlimited in her ability to "[a]dhere to basic standards of neatness and cleanliness"; was limited in her abilities to travel and use public transportation; and seriously limited in her ability to "interact appropriately with the general public" and "[m]aintain socially appropriate behavior."[32] (Tr. at 426.) Finally, Dr. Langsten opined that Plaintiff would be absent from work more than four days per month. (Tr. at 426.)

On October 24, 2008, Dr. Polukhin completed a questionnaire regarding Plaintiff's physical ability to do work-related activities. (Tr. at 436-39.) Dr. Polukhin concluded that Plaintiff could lift and carry ten pounds on a frequent basis and twenty pounds on an occasional basis. (Tr. at 436.) As for Plaintiff's ability to stand, walk, and sit, assuming normal breaks, Plaintiff could stand and walk approximately two hours and sit less than two hours in an eight-hour day. (Tr. at 436.) Dr. Polukhin specifically noted that Plaintiff "needs breaks" from sitting, and would only be able to sit, stand, or walk for an hour before changing positions. (Tr. at 437.) Dr. Polukhin also opined that Plaintiff would need to lie down every hour for approximately 5 to 15 minutes. (Tr. at 436.) Dr. Polukhin stated that these limitations were supported by "[p]ositive MRI, other imaging data, results of physical exam, and electrodiagnostic studies." (Tr. at 437.) Plaintiff could occasionally twist and stoop, but could never crouch or climb stairs or ladders; no medical findings were provided to support these limitations. (Tr. at 437.) When asked if Plaintiff is a malinger, Dr. Polukhin responded, "No," and wrote, "She is sick." (Tr. at 437.) Dr. Polukhin indicated that Plaintiff was affected in her ability to reach, handle, finger, feel, push, or pull. (Tr. at 438.) Dr. Polukhin observed that Plaintiff was "emotionally unstable" and

---

[32] Dr. Langsten's handwritten notes in this area are illegible. (Tr. at 426.)

"cognitively impaired and deconditioned, weak." (Tr. at 438.) As for environmental restrictions, Plaintiff was to avoid all exposure with extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, and gases as well as poor ventilation and hazards. (Tr. at 438.) Dr. Polukhin wrote that "[e]nvironmental factors can create exacerbation and aggravation of patient condition, physical and mental health" and that "[t]he patient is mentally challenged, emotionally unstable, and . . . might respond poorly to extreme factors." (Tr. at 438.) Dr. Polukhin additionally stated that Plaintiff's "major problems" were "emotional lability, deconditioning and poor stress tolerance," which rendered her "unable to tolerate [a] physical or sedentary job." (Tr. at 439.) Dr. Polukhin estimated that Plaintiff would be absent from work more than three times per month. (Tr. at 439.)

Over the course of 2008, Dr. Langsten completed five "Requests for Medical Opinion" forms in connection with Plaintiff's SSI application. (Tr. at 540-49.) Plaintiff's diagnosis varied only slightly over the course of these evaluations and generally included a depressive disorder, chronic posttraumatic stress disorder, borderline personality disorder, bipolar disorder, and polysubstance abuse/dependence in remission. (*See* Tr. at 541, 543, 545, 547, 549.) Dr. Langsten consistently indicated that Plaintiff was temporarily limited by her anxiety, depression, and mood instability. (*See* Tr. at 541, 543, 545, 547, 549.) Dr. Langsten also continuously described Plaintiff as having mental illness and chemical dependency, but that she was not developmentally disabled and did not have a learning disability. (Tr. at 541, 543, 545, 547, 549.) And each time, although stating that Plaintiff was not able to perform any employment in the foreseeable future, he recommended that Plaintiff be reevaluated in three months. (Tr. at 541, 543, 545, 547, 549.)

31

### D.  Vocational Expert

The ALJ presented the vocational expert with a hypothetical female who had no past work experience and

> who was between the ages of 42 and 45 with at least a high school education and impairments of degenerative disk [sic] disease of the lumbosacral spine; diagnosis of major depressive disorder; bipolar affective disorder; Post Traumatic Stress Syndrome.  And, well, if this combination of impairments were to limit that hypothetical woman to work at the light exertional level; with climbing up stairs or ramps limited to frequent; occasional climbing of ladders, ropes, or scaffolds; balancing limited to frequent; occasional stooping; frequent kneeling; crouching and crawling both limited to occasional.  The work would further be unskilled with brief and superficial contact with the public and coworkers, and no rapid or frequent changes in work routine due to reduced stress tolerance . . . ."

(Tr. at 36-37.)  The vocational expert testified that this hypothetical female could perform maid-work/cleaning, light-assembly, and machine-operation positions.  (Tr. at 37.)  The ALJ then asked the vocational expert to assume a hypothetical female with the physical limitations described by Dr. Polukhin and the additional limitations of being "unable to understand, remember, or carry out even simple work instructions."  (Tr. at 37-38.)  The vocational expert stated that such a person would not be competitively employable.  (Tr. at 38.)

### E.  Procedural History

Plaintiff's application for SSI was denied on May 30, 2007, and upon reconsideration on August 30, 2007.  (Tr. at 41, 44.)  Plaintiff subsequently requested a hearing before an administrative law judge (ALJ).  (*See* Tr. at 59.)  On June 24, 2009, Plaintiff had a hearing before ALJ David K. Gatto.  (Tr. at 10, 18.)  Initially, Plaintiff alleged an onset date of August 15, 2006.  (Tr. at 121.)  However, this date was subsequently amended to March 3, 2008, at the hearing.  (Tr. at 24.)

The ALJ found and concluded that Plaintiff has not engaged in substantial gainful activity since January 31, 2007; Plaintiff has the severe impairments of degenerative disc disease, major depressive disorder, and posttraumatic stress disorder; and Plaintiff's impairments, when considered individually or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (Tr. at 12-14.)  As for Plaintiff's residual functional capacity, Plaintiff is able to perform light work with the following restrictions: "she can only occasionally climb ropes and scaffolds; she can only occasionally stop, crouch, or crawl; she can frequently balance, kneel, and climb stairs and ramps; she is limited to unskilled work; she can tolerate no more than brief and superficial contact with the public and co-workers; [and] she cannot tolerate rapid or frequent changes in work routine due to reduced stress tolerance."  (Tr. at 14-17.)  In consideration of Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that a significant number of jobs exists in the national economy that Plaintiff could perform and, therefore, Plaintiff has not been disabled, as defined by the Social Security Act, since January 31, 2007.  (Tr. at 17-18.)  In finding that Plaintiff was able to perform light work with specified restrictions, the ALJ discounted the opinions of Dr. Langsten, noting that "[t]he record lack[ed] objective findings to support the extreme degree of limitation identified by Dr. Langsten" and that Dr. Langsten's opinion was "contradicted by Dr. Marshall's report," and Dr. Polukhin, whose findings the ALJ described as "exaggerated" and "not sustained by this record."  (Tr. at 15-16.)  With regard to Dr. Polukhin's opinion, the ALJ observed that (1) Plaintiff's residence in Minnesota makes "[i]t seem[] unlikely that she avoids all exposure to temperature extremes"; (2) Plaintiff does not have any established breathing disorder that would warrant limiting all exposure to airborne irritants;

and (3) Plaintiff's "standing and walking limitations are not consistent with [Plaintiff's] daily activities which include walking to and from downtown Minneapolis daily." (Tr. at 16)

On February 23, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. at 1)  Plaintiff brought this action on May 6, 2010 (Docket No. 1).  Plaintiff moved for summary judgment on November 29, 2010 (Docket No. 11).  The Commissioner moved for summary judgment on February 2, 2011 (Docket No. 19).

## III.   ANALYSIS

### A.  Standard of Review

This Court reviews whether the ALJ's decision is supported by substantial evidence when viewing the record as a whole.  42 U.S.C. §§ 405(g), 1383(c)(3); *Davidson v. Astrue*, 501 F.3d 987, 989 (8th Cir. 2007).  "Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind would find adequate to support the Commissioner's decision." *Davidson*, 501 F.3d at 989.  This Court "consider[s] the evidence that supports the ALJ's decision, as well as the evidence that detracts from it, and . . . will uphold the ALJ's decision if it is supported by substantial evidence on the record as a whole even if more than one conclusion could be drawn from the evidence."  *Leckenby v. Astrue*, 487 F.3d 626, 623 (8th Cir. 2007) (quotation omitted).  This Court "does not reweigh the evidence presented to the ALJ."  *Id.* (quotation omitted).  Thus, when substantial evidence supports the decision of the ALJ, this Court "will not reverse, even if substantial evidence could have been marshaled in support of a different outcome."  *England v. Astrue*, 490 F.3d 1017, 1019 (8th Cir. 2007).

A claimant must be disabled in order to receive SSI.  42 U.S.C. § 1382a(1).  An individual is considered to be disabled if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

> [A]n individual shall be determined to be under a disability only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(3)(B).  In determining whether an individual is disabled,

> the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4).  The

claimant generally bears the burden of proof regarding the existence of disability.  20 C.F.R.

§ 416.912(a).

In the instant case, Plaintiff challenges the weight that the ALJ accorded to medical

opinions in the record.  Plaintiff asserts that little weight was given to the work-related

limitations proffered by her treating physician, Dr. Polukhin, and, instead, the ALJ incorrectly

relied on the conclusory opinions of consultants who had never examined Plaintiff.  Plaintiff also

contends that the ALJ indiscriminately discounted the opinion of Dr. Langsten, her long-term

treating psychiatrist, and that the ALJ selectively credited certain aspects of Dr. Marshall's

opinion and not others without explanation.  For the reasons set forth below, this Court

recommends that Plaintiff's Motion for Summary Judgment be **DENIED** and the

Commissioner's Motion for Summary Judgment be **GRANTED**.

### B.  Impairments Do Not Meet or Equal a Listed Impairment

The ALJ found that Plaintiff had both physical and mental impairments, but that these impairments, either individually or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (Tr. at 12-14.)  Beginning with Plaintiff's physical impairment (degenerative disc disease), the record substantially supports the ALJ's conclusion that this impairment was severe, but did not meet or equal a listing, particularly with regard to Plaintiff's ability to walk, as the evidence shows Plaintiff frequently walked and experienced relief from pain after walking.  (*See* Tr. at 22, 29, 372, 354, 456.)

As for Plaintiff's mental impairments (major depressive disorder and posttraumatic stress disorder), the ALJ considered whether these impairments met or equaled the criteria of listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  The required level of severity for these disorders is met when both the A and B criteria are met for either listing, or when the C criteria is met for listing 12.04 or the A and C criteria are satisfied for listing 12.06.  *Id.*  To satisfy the B criteria, the impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, and pace; or repeated episodes of decompensation, each of extended duration.  *Id.*

Here, the ALJ found that Plaintiff has only a mild restriction in the activities of daily living as she attends to her grooming, performs light household chores, takes walks, attends two AA meetings per week, and watches television regularly.  (Tr. at 13.)  The record contains substantial evidence to support this mild restriction.  (*See* Tr. at 22, 34, 131, 317-18; *see also* Tr. at 261-62, 329, 404, 406, 428-29, 431-32, 434, 486, 533.)  Similarly, the ALJ found that Plaintiff has moderate difficulties in social functioning.  (Tr. at 13.)  Notwithstanding her legal

difficulties, Plaintiff is consistently oriented to time, place, and person; is generally cooperative; has good judgment and insight; has an appropriate affect; and is able to tolerate some interaction with others, characteristics which are all supported by substantial evidence in the record.  (*See* Tr. at 133, 260, 316-18, 35; *see also* Tr. 24-25, 261-62, 329, 404, 406, 428-29, 431-32, 434, 486, 533.)  The ALJ likewise found that Plaintiff has only moderate difficulties with regard to concentration, persistence, and pace.  (Tr. at 13.)  This moderate limitation is supported by substantial evidence, considering that, despite Plaintiff's complaints of difficulty sustaining attention, she watches television approximately three hours per day and is able to concentrate on the program and engages in crafts, including making jewelry and dream catchers.  (*See* Tr. at 317; *see also* Tr. at 34.)  Further, Dr. Marshall concluded that Plaintiff appeared to be feigning her attention deficits and had "very mild prefrontal cortex dysfunction."  (Tr. at 493-94.)  Dr. Karayusuf also noted that, while Plaintiff could not perform serial sevens and only had fair immediate digit recall, she could recall six digits forward and three digits backward, name four out of the last five Presidents of the United States in the proper order, and recalled three out of three unrelated objects after five minutes.  (Tr. at 318.)  Moreover, both Drs. Karayusuf and Langsten concluded that Plaintiff's cognitive functions were intact.  (Tr. at 406; *see also* Tr. at 261-62, 318, 329, 404, 406, 428-29, 431-32, 434, 486, 533.)  Finally, the ALJ concluded that there was no evidence of decompensation.  (Tr. at 14.)

Turning to the C criteria, the ALJ stated that

> the evidence fails to establish the presence of the "paragraph C" criteria.  The undersigned finds that the evidence of record does not support a finding that [Plaintiff] has had repeated episodes of decompensation; that she has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate; nor that she has a current

history of one or more years' inability to function outside a highly
supportive living arrangement.

(Tr. at 14.)    After reviewing the record in this matter, this Court concludes that the record

supports the ALJ's conclusion that there is no evidence of decompensation.  In sum, the ALJ did

not err in concluding that Plaintiff's impairments do not meet or equal one of the listed

impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.

### C.  Weight of Medical Opinions

Overall, the weight accorded to a particular medical opinion is based on considerations of

(1) whether the source examined the claimant; (2) the treatment relationship; (3) the

supportability of the source's opinion, including explanations, medical signs, and laboratory

findings; (4) the opinion's consistency with other evidence; (5) whether the source is a specialist

in the area; and (6) other factors that may be relevant under the circumstances.  *Id.*

§ 416.927(d)(1)-(6).  Generally, those opinions from treating sources are given greater weight

because "these sources are likely to be the medical professionals most able to provide a detailed,

longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations."  *Id.* § 416.927(d)(2).  A treating source's

opinion concerning the nature and severity of a claimant's impairments will be given controlling

weight if it "is well-supported by medically accepted clinical and laboratory techniques and is

not inconsistent with the other substantial evidence in [the] case record."  *Id.*

In determining whether to give controlling weight to the opinion of a treating source, the

record is viewed as a whole.  *Halverson*, 600 F.3d at 929; *see* 20 C.F.R. § 416.927(d)(2).  "When

a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole,

they are entitled to less weight."  *Halverson*, 600 F.3d at 929-30 (quotation omitted).  If the

opinion of a treating source is not given controlling weight, the following factors are considered

when evaluating the opinion: the length of time the source treated the claimant; the number of

times the claimant was seen; the source's knowledge regarding the impairments; the kind of

treatment provided; and "the kinds and extent of examinations and testing the source has

performed or ordered from specialists and independent laboratories."     20 C.F.R.

§ 416.927(d)(2)(i)-(ii).   "When an ALJ discounts a treating physician's opinion, he should give

'good reasons' for doing so."   *Davidson*, 501 F.3d at 990; *see* 20 C.F.R. 416.927(d)(2) (stating

the Commissioner will "give good reasons" for the weight accorded to a treating source's

opinion).

### i.      Dr. Polukhin

The ALJ placed "limited weight" on the opinion of treating source Dr. Polukhin, noting

that "[t]he nature and degree of limitation imposed by Dr. Polukhin is not sustained by this

record" and "[b]ecause Dr. Polukhin's responses are not supported by objective findings, they

seem exaggerated."   (Tr. at 16.)   Plaintiff contends that the ALJ erred when he rejected

limitations imposed by Dr. Polukhin by heavily relying on consultants who never examined

Plaintiff and ignoring supportive evidence from other medical sources.

First, the ALJ was required to take into account the findings and opinions of Drs. Atkin

and Larson, the consultants who rendered opinions on Plaintiff's physical abilities.   20 C.F.R.

§ 416.627(f)(2)(i) (stating ALJs "must consider findings and other opinions" of state agency

medical and psychological consultants as well as other program physicians, psychologists, and

medical specialists, but are not bound by such findings).   This is because "State agency medical

and psychological consultants and other program physicians, psychologists, and other medical

specialists are highly qualified physicians, psychologists, and other medical experts who are also experts in Social Security disability evaluation." *Id.*

Second, the treating source's opinion must be "well-supported" and not inconsistent with other evidence. *Id.* § 416.927(d)(2). The objective testing cited in Dr. Polukhin's report does not support the severe limitations identified by Dr. Polukhin. Plaintiff's MRI results indicate that she had "mild to moderate" neural foraminal narrowing. (Tr. at 284.) The electrodiagnostic study conducted by Dr. Polukhin revealed "[p]eripheral polyneuropathy, primarily demyelinating affecting motor and sensory nerves of both legs" and chronic, left-side radiculopathy, but contained no findings regarding the degree to which these diagnoses affected Plaintiff. (*See* Tr. at 538.)

Further, "[i]t is the ALJ's duty to resolve conflicts in the evidence." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). While Plaintiff contends that the ALJ failed to consider medical information from other sources that supported Dr. Polukhin's opinion, including Southam (her physical therapist) and Tomshine (a certified nurse practitioner), information from other sources supported the ALJ's conclusion that Plaintiff's impairments were not as limiting, including Plaintiff's chiropractor, Dr. Printon, who observed that Plaintiff had moderate loss of lumbar extension and that, while pain was present initially, it diminished with repeat extension. (Tr. at 443.) At the same time Plaintiff was seeing Dr. Polukhin, Dr. Printon observed that Plaintiff had minimal loss of motion. (Tr. at 454.)

Third, as the ALJ correctly observed, there were no findings indicating the presence of a breathing disorder warranting Dr. Polukhin's assessment that Plaintiff should avoid all exposure to airborne irritants. (Tr. at 16, 438.) Similarly, there are no findings to support environmental restrictions. Dr. Polukhin merely stated that these conditions "*can* create exacerbation and

aggravation" of Plaintiff's impairments and that Plaintiff "*might* respond poorly to extreme factors." (Tr. at 438 (emphasis added).)  But Dr. Polukhin had not previously recommended that Plaintiff avoid exposure to these types of environmental factors.  *See Pirtle v. Astrue*, 479 F.3d 931, 934-35 (8th Cir. 2007) (ALJ properly discounted opinion of treating physician as to claimant's need for 30 minutes of rest every 3 hours when physician's residual-functional-capacity assessment stated such rest would be beneficial, but did not require it; physician had not previously advised claimant to rest every 3 hours; and claimant did not report the need to rest every 3 hours).

Finally, Dr. Polukhin's limitations on Plaintiff's ability to sit and stand are also contradicted by evidence in the record.  While Dr. Polukhin stated that Plaintiff needed to rest every hour for 5 to 15 minutes, this restriction had not been previously imposed.  *See id.*; *see also Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (treating physician's opinion properly discounted when opinion was inconsistent with physician's treatment notes).  At the hearing, Plaintiff testified that she typically rested for approximately 90 minutes in the afternoon.  (Tr. at 22, 26.)  Additionally, Plaintiff said that she spent approximately half of her time in a reclined position, and that she walked between one and two miles downtown with her fiancé every day. (Tr. at 22, 29.)  Plaintiff stated that the reason that she "liked doing that [walking] so much in the morning is because . . . it helps me to stretch out my back . . . ."  (Tr. at 29.)  Plaintiff also told several of her treatment providers that walking helped with her pain.  (*See* Tr. at 372, 354, 456.) It is also noteworthy that as late as May 5, 2009, Dr. Polukhin noted that Plaintiff "is doing better and . . . is happy about her progress."  (Tr. at 519.)  Therefore, the ALJ did not err in placing only limited weight on Dr. Polukhin's opinion because there was substantial evidence in the record, including Plaintiff's own testimony regarding her daily activities, indicating that such

extreme limitations were not well supported or warranted.  *See Davidson*, 501 F.3d at 990-91 (record contained good reasons to reject limitations concerning claimant's ability to sit, stand, and walk when limitations were not supported by treating physician's prior notes, were inconsistent with rehabilitation regimen, and were undermined by claimant's testimony regarding regular attendance at daughter's basketball games).

### ii.      Dr. Langsten

In evaluating Plaintiff's mental ability to do work-related activities, Dr. Langsten concluded that Plaintiff was unable to meet competitive standards regarding semiskilled and skilled work. (Tr. at 426.)   When evaluating Plaintiff's mental abilities for unskilled work, however, Dr. Langsten concluded that Plaintiff was unable to meet competitive standards only with regard to remembering work-like procedures; Dr. Langsten categorized Plaintiff as limited but able to satisfactorily perform in three categories and seriously limited but not precluded from performing in all circumstances in ten categories.  (Tr. at 425.)  The ALJ concluded that "the record lacks objective findings to support the extreme degree of limitation identified by Dr. Langsten." (Tr. at 15.)  Plaintiff contends that the ALJ erred by not placing significant weight on Dr. Langsten's opinion because it was based upon a long history of treatment and mental status examinations.

As the Commissioner points out, the limitations identified by Dr. Langsten are inconsistent with his treatment notes.  Dr. Langsten consistently described Plaintiff as somewhat anxious, but not depressed, and noted that her affect was appropriate; her cognitive functions were generally intact; she lacked suicidal ideation or psychotic symptoms; her judgment and insight were adequate; and her motivation for treatment was "good."  (Tr. at 261-62, 404, 406,

408, 428-29, 431-32, 434, 486, 533.)  The ALJ is permitted to discount the opinion of a treating physician when it is inconsistent with the physician's treatment notes.  *Martise*, 641 F.3d at 925.

In addition, the consultants identified limitations similar to those identified by Dr. Langsten, just not to the same degree.  Dr. Langsten, along with consultants Drs. Karayusuf and Conroe, all concluded that Plaintiff was able to understand, retain, and follow short, simple instructions; was limited but not precluded from maintaining pace and persistence for unskilled tasks; and was limited but not precluded from interacting with the public and co-workers.  (Tr. at 318, 335; *see* Tr. at 425-26.)  Drs. Langsten and Conroe both noted that Plaintiff could tolerate only minimal amounts of work stress.  (Tr. at 335, 425.)  Likewise, Dr. Marshall concluded that "[f]rom the standpoint of cognitive functioning alone, competitive employment . . . is possible in a wide variety of situations where fully intact attention, abstract reasoning, and planning/organization abilities are not a critical factor."  (Tr. at 503.)  These findings are all consistent with the ALJ's finding that Plaintiff could perform unskilled work that involves only brief, superficial contact with the public and co-workers and has only minimal changes in routine.  *See* 20 C.F.R. § 416.968(a) (defining "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time").

Finally, Plaintiff's own description of her activities was not consistent with the degree of limitation proffered by Dr. Langsten.  Plaintiff testified that she makes jewelry, which entails her to focus on piece for three to four hours at a time, spends time with her fiancé, goes to AA meetings twice per week, meets with her sponsor, and talks with her family by phone.  (Tr. at 34-35.)  Therefore, the ALJ did not err in discounting the opinion of Dr. Langsten when the degree of limitation identified was not consistent with substantial evidence in the record.

### iii.    Dr. Marshall

Plaintiff contends that the ALJ discounted Dr. Marshall's conclusions regarding Plaintiff's cerebral dysfunction, attention deficits, and need for increased supervision.  Plaintiff also points to Dr. Marshall's conclusion that "stable, gainful employment [has been and will likely continue to be] impossible [for Plaintiff] in the real competitive job market."  (Tr. at 503.)

First, Dr. Marshall's statement that Plaintiff is not able to maintain stable, gainful employment does not qualify as a medical opinion.  *See* 20 C.F.R. § 416.927(e), (e)(1) (medical source's opinion that claimant is "unable to work" does not necessarily mean claimant is under a "disability"); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (treating physician's opinion that claimant is unable to work is not the type of medical opinion entitled to controlling weight).  A decision on an issue "that would direct the determination or decision of disability," like the ability to work, is a dispositive one and is therefore reserved to the Commissioner.  20 C.F.R. § 416.927(e).    Moreover, Dr. Marshall reached this conclusion after factoring in Plaintiff's prior substance abuse and psychiatric history, (Tr. at 503), which, as the Commissioner points, is not borne out by substantial evidence in the record.  Plaintiff testified at the hearing that she felt "good" about her sobriety and that it "is a source of pride for [her]."  (Tr. at 35.)  The record also indicates that Plaintiff regularly attends AA meetings, maintains contact with her sponsor, and has not had a significant relapse since attending the Park Avenue treatment program in March 2008.  (*See* Tr. at 24, 35, 317, 422-23.)  Similarly, Dr. Langsten's notes consistently indicate that Plaintiff does not present with psychotic symptoms.  (*See* Tr. at 261-62, 404, 406, 428-29, 431-32, 434, 486, 533.)

Second, the ALJ placed "some weight" on Dr. Marshall's opinion, noting that the record did not reflect "more than moderate limitations" in Plaintiff's attention abilities and that Dr.

Marshall found that Plaintiff "had results indicative of feigning of sustained attention deficits." (Tr. at 13, 15.)  While Plaintiff asserts that "Dr. Marshall provided extensive discussion of the testing" and that "[t]he ALJ cannot say in good faith that Dr. Marshall's opinions are not supported by a wealth of objective testing," the ALJ's assignment of limited weight to Dr. Marshall's opinion appears to reflect Dr.  Marshall's own suspicions and reservations about Plaintiff's test results.  Dr. Marshall documented several instances in which Plaintiff's results were "unusually variable" or inconsistent with the presence of an attention deficit disorder, calling into question the validity of the results as a whole.  (*See* Tr. at 493, 499-501.)  Dr. Marshall specifically stated that Plaintiff's test results could not be "taken at face value" because of "apparent feigning of deficits."  (Tr. at 499.)  While Plaintiff emphasizes the time spent conducting the tests, interviewing her, and writing the report, the conclusions Dr. Marshall reached after the test battery did not warrant placing greater weight on Dr. Marshall's opinion. The ALJ appears to have discounted Dr. Marshall's opinion not because it lacked acceptable medical support but, rather, because Dr. Marshall himself questioned the accuracy of the results. While the ALJ could have more clearly explained why Dr. Marshall's opinion was discounted, this limited reliance is supported by substantial evidence when viewing the record as a whole given that (1) the ALJ only placed some weight on the opinion, particularly with regards to the likelihood that Plaintiff was misrepresenting her attention deficits; (2) Dr. Marshall's own reservations about the accuracy of the results; and (3) the ALJ's ultimate conclusion that Plaintiff was not severely limited by an attention deficit disorder.

Third, turning to Plaintiff's challenge to the hypothetical question posed by the ALJ, Plaintiff argues that the ALJ failed to include Dr. Marshall's statement that Plaintiff required "unusual levels of supervision."  (Tr. at 503.)  Plaintiff is correct that the degree to which a

person needs additional supervision can reduce a person's inability to work.  *Cf.* 20 C.F.R. § 416.945(c) ("A limited ability to respond appropriately to supervision may reduce a person's ability to work.").  But the ALJ is only required to incorporate into the hypothetical question "those impairments and limitations found credible by the ALJ."  *Vandenboom*, 421 F.3d at 750; *see Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (stating the hypothetical question posed by the ALJ need only include impairments substantially supported by the record).  Here, the ALJ's hypothetical question included all of the impairments and residual-functional-capacity limitations that the ALJ determined were supported by substantial evidence.  (*Compare* Tr. at 12, 14-17 *with* Tr. at 36-37.)  The question reflected Plaintiff's impairments of degenerative disc disease, major depressive disorder, bipolar affective disorder, and posttraumatic stress disorder; her ability to perform light, unskilled work; and the additional limitations of reduced contact with others and few changes in routine.  (Tr. at 37.)  Because the ALJ did not conclude that there was substantial evidence to support any supervision limitation, the ALJ properly excluded it from the hypothetical.  *See Martise*, 641 F.3d at 927 (concluding hypothetical question was proper when it contained only those limitations found to exist by the ALJ and set forth in the claimant's residual functional capacity).

[Continued on next page.]

## IV.    RECOMMENDATION

Based upon the record, memoranda, and files herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 11) be **DENIED** and the Commissioner's Motion for Summary Judgment (Docket No. 19) be **GRANTED**.

Dated:  July 26, 2011

           _s/ Tony N. Leung_
          Tony N. Leung
          United States Magistrate Judge
          for the District of Minnesota

          _Barkhuff v. Astrue_
          File No. 10-cv-01975 (SRN/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **August 11, 2011**.